**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X

UNITED STATES OF AMERICA

            - against -

JOHN A. BURKE, et al.,

                         Defendants.
----------------------------------------------------------X

**REPORT AND RECOMMENDATION**

09-CR-0135 (S-5) (SJ) (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

I.    <u>Background</u>

      A grand jury has accused defendant John A. Burke ("Burke") of racketeering conspiracy based on predicate acts including three murders, narcotics trafficking, robbery, and other offenses, in violation of 18 U.S.C. § 1962(d); two counts of murder relating to the death of John Gebert ("Gebert"), in violation of 18 U.S.C. § 1959(a)(1) and 21 U.S.C. § 848(e)(1)(A); and two counts relating to the use and carrying of firearms in connection with some of the other offenses, in violation of 18 U.S.C. §§ 924(c) and 924(j). Docket Entry ("DE") 162 (Superseding Indictment) ("Ind."). In two omnibus motions (the first of which was filed prior to the latest version of the indictment) Burke seeks various forms of relief including dismissal of all charges on a variety of theories, suppression of evidence, an order requiring the government to narrow the charges on the grounds that they are multiplicitous, severance of his trial from that of his codefendants, a bill of particulars, a separate trial of one of the predicate racketeering acts, discovery relief, and relief pursuant to *Brady v. Maryland*, 37 U.S. 83 (1963). DE 124; DE 177. The Honorable Sterling Johnson, Jr. has referred all of the motions to me for a report and recommendation. Orders dated July 21, 2010, and February 17, 2011. I now make my report, addressing each of Burke's requests for relief in turn. For the reasons set forth below, I respectfully recommend that the court deny all of Burke's requests for relief.

II.    <u>Discussion</u>

A.    <u>Dismissal Of All Counts: Double Jeopardy Clause</u>

In his first request for relief, Burke asserts that he is entitled to have the entire indictment dismissed pursuant to the Double Jeopardy clause of the Fifth Amendment because he has previously been prosecuted in New York State for the murders of both Gebert and Bruce Gotterup ("Gotterup"). *See* DE 124-1 (memorandum of law in support of Burke's first omnibus motion) ("Memo. I") at 1-4. The instant indictment alleges that Burke committed the murders of Gebert and Gotterup in violation of New York State law as predicate racketeering acts Three (B) and Five (B) within the racketeering conspiracy offense charged in Count One; the indictment also includes allegations that Burke conspired to commit the same murders in violation of New York State law (predicate racketeering acts Three (A) and Five (A), pleaded as alternatives to the respective substantive murder violations), as well as additional charges relating to the Gebert murder alone that arise exclusively under federal law.

The parties agree that under the normal application of the doctrine of dual sovereignty, the fact that Burke was previously tried in New York for the murders alleged in the instant indictment would not bar his later trial on any similar federal charges. As a result, in order to secure relief on this claim, Burke must show either that one prosecuting sovereign is acting merely as the tool of the other or that one prosecution is no more than a sham and cover for the other. *See* Memo. I at 1-2; DE 128 (memorandum of law in opposition to Burke's first omnibus motion) ("Opp. I") at 4-5; *Bartkus v. Illinois*, 359 U.S. 121, 123-24 (1959); *United States v. 38 Whaler's Cove Drive*, 954 F.2d 29, 38 (2d Cir. 1992) (citing *United States v. Aboumoussallem*, 726 F.2d 906, 910 (2d Cir. 1984)).

Burke has failed to make any such showing, or even to demonstrate that an evidentiary hearing on the matter is warranted. He asserts nothing more than that federal law enforcement agents were "intimately involved in the State investigations of both the Gotterup and Gebert homicides." Memo. I at 2. Such cooperation among investigative agents does not suffice to defeat the applicability of the dual sovereignty doctrine. *See*, *e.g.*, *United States v. Coonan*, 938 F.2d 1553, 1563 (2d Cir. 1991); *Aboumoussallem*, 726 F.3d at 910 n.3; *United States v. Russotti*, 717 F.2d 27, 31 (2d Cir. 1983). I therefore respectfully recommend that the court deny his motion to dismiss the indictment on the ground that it violates the Double Jeopardy clause.[1]

B.     <u>Dismissal Of Counts One And Four: Statute Of Limitations</u>

Burke next argues that Counts One and Four should be dismissed as time-barred. Memo. I at 4-6. Count One charges Burke with engaging in a racketeering conspiracy over a 30-year period from January 1980 through January 2010; Count Four alleges that during the same period he possessed, used, and carried one or more firearms in furtherance of the latter violent crime. Ind. ¶¶ 15, 46.[2] Burke argues that the racketeering conspiracy count is foreclosed because all of the allegations of predicate racketeering acts describe offenses committed no later than 2001 – more than five years before the return of the indictment. He then contends that if the racketeering conspiracy charge is time-barred, the related weapons offense must suffer from the same defect.

---

[1] Even if the court rejects the foregoing analysis and finds a double jeopardy violation, Burke should obtain no more relief than the striking of Racketeering Acts Three and Five in Count One and the dismissal of Counts Two and Three. Burke makes no attempt to explain why his earlier prosecution for murder would preclude his prosecution now for a racketeering conspiracy not predicated on the murders or for related weapons-possession offenses.

[2] When the first omnibus motion was filed, the version of the indictment then in effect alleged that the conspiracy charged in Count One and the weapons offense charged in Count Four both covered a shorter period, from November 1990 through July 2008. DE 72 ¶¶ 14, 35. The change has no bearing on the substance of either the parties' arguments or my analysis.

As a threshold matter, I note that Burke's description of the racketeering acts alleged in Count One was accurate when submitted, but that it is no longer correct: the pending indictment also includes a predicate racketeering act accusing co-defendant David D'Arpino ("D'Arpino") of conspiring and attempting to tamper with a witness during the period from May 2009 through January 2010. Ind. ¶¶ 38-40. Although it remains true that the predicate acts in which Burke himself is named allege conduct occurring no later than 2001, the indictment now charges Burke with engaging in a conspiracy pursuant to which an alleged member of the conspiratorial group committed a criminal offense well within the limitations period. That fact alone precludes Burke's argument. *See*, *e.g.*, *Salinas v. United States*, 522 U.S. 52, 63-64 (1997).

Even considering the motion against the backdrop of the earlier version of the indictment – when no predicate racketeering act was alleged to have occurred later than 2001 – Burke is still not entitled to relief. The indictment alleges that the charged racketeering conspiracy extended into the limitations period. That allegation in a facially valid indictment is not amenable to summary disposition by means of a motion to dismiss; it must instead be considered by a trial jury. *See*, *e.g.*, *United States v. Carnesi*, 461 F. Supp. 2d 97, 98-99 (E.D.N.Y. 2006). Moreover, the pertinent case law of this circuit makes clear that Burke's argument erroneously conflates the pattern element of the charged racketeering offense with the statute of limitations. The latter refers to the offense as a whole, not the predicate racketeering acts. A conspiracy to conduct the affairs of a criminal enterprise through a pattern of racketeering acts can exist long after the last such act known to the grand jury has been committed. Indeed, if the government can prove the existence of the racketeering conspiracy charged, it is entitled to a presumption that the conspiracy continued in existence absent proof that it was discontinued or that Burke withdrew. *See*, *e.g.*, *United States v. Pizzonia*, 577 F.3d 455, 461-62 (2d Cir. 2009); *United States v. Eppolito*, 543 F.3d 25, 49 (2d Cir.

2008) (citing *United States v. Spero*, 331 F.3d 57, 60-61 (2d Cir. 2003)); *United States v. Yannotti*, 541 F.3d 112, 121-23 (2d Cir. 2008); *United States v. Salerno*, 868 F.2d 524, 534 (2d Cir. 1989) (citing *United States v. Persico*, 832 F.2d 705, 713 (2d Cir. 1987)).

Accordingly, I respectfully recommend that the court deny Burke's motion to dismiss Count One as time-barred. Because the motion to dismiss Count Four on that ground, as initially asserted in Burke's first omnibus motion, rested entirely on the arguments directed against Count One, I respectfully recommend that the court deny that part of his motion as well.[3]

C.    Suppression

Burke next seeks to suppress statements he allegedly made to law enforcement agents on May 15 and June 5, 2001, respectively, without having been warned of his privilege against self-incrimination; he also asserts that the second statement he allegedly made was elicited in violation of his right to counsel under the Sixth Amendment. Memo. I at 6-11. I held a hearing on the motion on October 1, 2010. DE 149 (minute entry); *see also* DE 197 (transcript of hearing "Tr."). As explained on the record at the close of that hearing, and as further discussed below, I recommend against suppression of either statement.

1.    Statements Made On May 15, 2001

The parties agree that on May 15, 2001, New York City Police Detectives Thomas Mansfield ("Mansfield") and James Annunziata interviewed Burke at the Ulster Correctional Facility, where he was then incarcerated on the basis of a unrelated parole violation otherwise unrelated to this case. Burke claims that on the day of the interview, he was in his dormitory when a corrections officer informed him that two detectives had arrived to interview him. Burke initially

---

[3] I address below in Part K of this discussion the request in Burke's second omnibus motion to dismiss Counts Four and Five on the ground that they are untimely.

declined to go to the interview room, but acceded after being told that if he refused to let the detectives interview him, he would be sent to the facility's Special Housing Unit ("SHU").[4] Burke was then escorted to an interview room, where the detectives spoke with him for approximately two hours. Among other questions, the detectives interviewed Burke about the Gebert murder. Mansfield wrote a report dated May 15, 2001, summarizing statements that Burke allegedly made during the interview.[5] The parties agree that the detectives did not warn Burke of his *Miranda* rights before questioning him. Tr. 29, 54. They further agree that Burke was not handcuffed during the interview and that the detectives did not display weapons. Tr. 7-8, 57, 62. Burke testified that the detectives were "nice" throughout the interview, and that when the interview concluded, he knocked on the door of the interview room, at which point a corrections officer – not the one who had threatened to place Burke in the SHU if he failed to speak to the detectives – unlocked the door and removed Burke while the detectives remained behind. Tr. at 61-62.[6] Burke further testified that, as far as he knew, he was free to leave the interview at any point, and that the only constraint

---

[4] Burke's account of the details of his interaction with the corrections officer has varied over time. In a declaration submitted in support of his motion, he asserted that the officer was at first unable to tell him the identity of his visitors, and had to make a telephone call to find out who was waiting to speak to Burke. DE 124-5 ("Burke Decl.") ¶¶ 1-2. At the suppression hearing, Burke testified that the officer initially told him that two detectives wanted to see him, and made no mention of an intervening telephone call. Tr. at 49. Although I generally found Burke to be a less credible witness than Mansfield on matters as to which they disagreed, Burke's failure to recount the precise details of his conversation with the unnamed corrections officer in a consistent way has little if any bearing on my analysis.

[5] The report, marked as Government Exhibit 3500-TM-1 at the suppression hearing, has two pages. The first page of the report renders the date as "5/15/09" while the second page renders it as "5/15/01" – leading me to infer, under all of the circumstances, that the former is a typographical error.

[6] Mansfield testified that the door of the interview room was not locked. Tr. at 8. While I found him more credible in this regard than Burke's testimony to the contrary, a finding to the contrary would not alter my conclusion that Burke was not in custody for purposes of *Miranda* during the interview.

on his freedom to do so was the threat that such a decision would result in his confinement in the SHU. Tr. at 55, 58-59. Despite that alleged threat, however, at no point did anyone from the prison check in on the interview to determine whether Burke was in fact answering the detectives' questions, and the officer who removed Burke from the interview room did not inquire about the matter before allowing Burke to leave. Tr. at 59, 62, 70-71.

Under these circumstances, I cannot recommend suppression of any statement Burke made in his interview with the detectives. Consistent with the law of this circuit, the parties agree that the motion to suppress such statements turns on whether the interview was custodial – and that in the context of this case, where Burke was already imprisoned on an unrelated matter, the custody requirement is not satisfied merely by the fact of Burke's incarceration. Rather, the parties agree, there must be some circumstance that rendered Burke's meeting with detectives itself custodial. *See, e.g., Georgison v. Donelli*, 588 F.3d 145, 155-57 (2d Cir. 2009).[7] The parties further appear to agree that the latter question turns on whether Burke was in fact threatened with confinement to the SHU in the event he declined to speak with the detectives – and that therefore the motion to suppress the statements made in the interview is a straightforward question as to whether Burke's assertion in that regard is credible. Even in the absence of any direct evidence to the contrary, I conclude that it is not.

In general, I found Mansfield to be a credible witness. Burke's testimony was less persuasive: he was combative on certain points, inconsistent on others, and at times said things that

---

[7] The Supreme Court has not yet explicitly decided whether overt questioning by law enforcement agents of a prisoner must always be considered to be custodial interrogation for purposes of *Miranda*. The Court recently granted certiorari in a case that may present just that question. *See Howes v. Fields*, 617 F.3d 813 (6th Cir. 2010), *cert. granted*, 2011 WL 197644 (U.S. Jan. 24, 2011). If the Court determines that such questioning does constitute custodial interrogation *per se*, my reliance on such authority as *Georgison* will of course no longer be valid.

did not have the ring of truth.[8] On the ultimate issue of custody, I conclude that the threat of confinement in the SHU that Burke asserted caused him to speak to the detectives was not made. If prison officials did indeed insist that Burke subject himself to interrogation on pain of administrative segregation – and I note that there is no evidence that Mansfield or his partner asked them to do so – it makes no sense that they would not have satisfied themselves, before allowing Burke to leave the interview room and return to the general prison population, that he had indeed answered the detectives' questions to their satisfaction. I therefore conclude that Burke was not subjected to custodial interrogation on May 15, 2001, and that the detectives' failure to administer *Miranda* warnings in advance of their interview of Burke on that date accordingly does not require the suppression of Burke's statements during the interview. I therefore respectfully recommend that the court deny Burke's motion to suppress such statements.

2.     Statements Made On June 5, 2001

Burke also seeks to suppress a statement he made on June 5, 2001, while Detectives Mansfield and others drove him to their police precinct for processing on a new arrest. The record is somewhat unclear, however, as to the precise statement Burke seeks to suppress or the reason he believes he is entitled to such relief.

Mansfield testified that on June 5, 2001, he and two of his colleagues went to the Downstate Correctional Facility, where Burke was then incarcerated, to execute a warrant for Burke's arrest and transport him back to their precinct for processing. After placing Burke under arrest and placing him in the back seat of the officers' car, Mansfield informed Burke that he was

---

[8] As an example of the latter, when asked if he was concerned that anyone else might "c[o]me to believe that he had discussed cooperation and ultimately decided not to cooperate," as Mansfield had testified, Burke responded that he had no such concern. Tr. at 71; *see id*. at 10-12 (Mansfield). Although there was no objective evidence to rebut that assertion, both the content of Burke's testimony in that regard and his demeanor in giving it gave me pause about its veracity.

being arrested for the murders of Gebert and Gotterup. Tr. 13-15. Upon hearing that news, according to Mansfield, Burke "looked at [Mansfield] and he took a deep breath. Then he let it out. His head dropped. He just said, 'I never killed an innocent person. I've done a lot of things in my life, but I've never killed an innocent person.'" *Id*. at 15-16. Mansfield acknowledged that he did not warn Burke of his *Miranda* rights before Burke allegedly made this statement, but also asserted that the statement was not in response to any interrogation. *Id*. at 15. Later during the same 45-minute trip, Mansfield testified, he informed Burke that the authorities had monitored his telephone calls from prison and played one such recording for Burke. *Id*. at 16. Mansfield said his purpose was to lead Burke to think that the police "had tapes for every conversation he possibly could have had[.]" *Id*. at 17. Mansfield testified that playing the recording did not prompt Burke to make any statements. *Id*.

Burke's account of the journey, and of his exchanges with Mansfield, was markedly different. He agrees that Mansfield first told him that he was being arrested for the murders of Gebert and Gotterup at the time he was placed in the officers' car. Burke insisted, however, that he said nothing in response to the news. *Id*. at 53. He further testified that it was only after Mansfield played a recording, on which Burke recognized his own voice, that he "said something to the detective." *Id*. at 53-54. On direct examination, Burke did not specify just what it was that he said to the detective. *See id*. at 54-55.[9] Pressed for a clarification on cross-examination, Burke testified that "[t]he comment was I made some mistakes in my life, but I never killed anybody. " *Id*. at 67.

---

[9] Burke likewise avoided specifying the statement he wished to suppress in his initial motion papers. *See* Burke Decl. ¶ 9 (asserting that "[i]n response to the Detectives['] actions, I made a comment" without describing its content). Burke's efforts to avoid specificity on this central issue for as long as possible – an effort that seems designed to preserve the option of asserting the truth of whichever one of two irreconcilable factual positions ultimately might prove the most expedient – further undermines my confidence in his veracity.

The parties thus disagree as to whether Burke made an implicitly self-incriminating statement (suggesting that he had killed only persons who were not "innocent") or an explicitly exculpatory one ("I never killed anybody"). Burke wishes to suppress either, *see id*. at 73, but I presume that the government does not seek to offer the latter into evidence, and that his motion in that regard is therefore moot.

Arguably, the motion to suppress the incriminating statement is moot as well: Burke is *not* saying the statement the government seeks to introduce in evidence at his trial was elicited in violation of his rights; he simply denies making the statement at all. For that reason alone, the court could deny even a suppression hearing, on the ground that the defendant has failed to show the existence of a disputed fact supporting suppression. *See*, *e.g.*, *United States v. Jailall*, 2000 WL 1368055, at *8 (S.D.N.Y. Sept. 20, 2000) (defendant bears the burden of showing the existence of a disputed fact that supports suppression). As a result, the fact that Burke does not contend that the government compelled him to make an incriminating statement can and should suffice for the court to deny his motion.

In the alternative, I recommend denying the motion on its merits. If, as Mansfield testified, Burke made his statement as a spontaneous reaction to learning of the reason for his arrest, the statement was not the product of custodial interrogation and should not be suppressed due to the officers' failure to warn Burke of his *Miranda* rights. On the other hand, if Burke made the statement in response to Mansfield's decision to play a recording for Burke – an action that Mansfield acknowledged was intended to "plant a seed" in Burke's mind in the hope of gaining his "cooperation" (*id*. at 29) – then the failure to warn Burke of his rights in advance of the statement might well be a basis for suppression. Burke was plainly in police custody during the car trip, and

Mansfield's statements seem plainly to have been designed to elicit an incriminating response from Burke. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

Resolving Burke's motion on the merits thus requires a determination as to when Burke spoke of killing – before Mansfield played the recording, or after. The latter question, in turn, requires a fact-finder to decide whether Mansfield's account was more credible, or Burke's. Having viewed and listened to the testimony of both witnesses in person, and taking into account all of the surrounding circumstances, I found Mansfield to have the more credible demeanor and the more believable version of events. As I noted at the time of the hearing, Burke was more selective than Mansfield in purporting to rely on the passage of time to explain his difficulty in providing a consistent account of the events of 2001. Whether the difference between the two accounts is a matter of honestly differing recollections or something else, I found that on the relatively few matters in dispute between Burke's testimony and Mansfield's about the events of June 5, 2001, Mansfield was more credible. I therefore accept as true his testimony that Burke made an implicitly incriminating statement as a spontaneous reaction to being told that he had been arrested for murdering Gebert and Gotterup. As a result, I respectfully recommend that the court deny Burke's motion to suppress that statement.

D.      Bill of Particulars

Burke next asks the court to compel the government to provide a bill of particulars. Memo. I at 11-13; DE 177-1 (memorandum of law in support of Burke's second omnibus motion) ("Memo. II") at 12-13. Such relief "is not required where the indictment advises the defendant of the specific acts of which he is accused or where the government has made sufficient disclosure by other means." *United States v. Javed*, 2009 WL 536071, at *3 (E.D.N.Y. Mar. 3, 2009) (Johnson, J.) (citing *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir.1999)). As the government

acknowledges, the indictment, combined with the government's disclosures pursuant to applicable discovery rules, must provide sufficient specificity to avoid unfair surprise to the defendant, to guard against double jeopardy, and to prevent the government from proving the elements of the charged offenses through facts other than those considered by the grand jury. *See* DE 188 (memorandum of law in opposition to Burke's second omnibus motion) ("Opp. II") at 27 (citing *Russell v. United States*, 369 U.S. 749, 763 (1962); *Walsh*, 194 F.3d at 44; *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)).

I conclude that the indictment alone plainly satisfies those requirements with respect to most of the charges. I am less sanguine – albeit only slightly so – with respect to the drug trafficking charges charged as Racketeering Act One and the robbery offenses charged as Racketeering Act Six within the first count. *See* Ind. ¶¶ 17-19, 32-34. The former allegations span more than two decades – and also, I note in passing, combine into one predicate act charges that were formerly charged as two distinct such acts. *Compare* Ind. ¶¶ 17-19 (alleging offenses involving distribution of cocaine and marijuana) *with* DE 72 ¶¶ 16-18 (alleging offenses involving distribution of cocaine alone), 19-21 (alleging offenses involving distribution of marijuana alone). The allegations of Racketeering Act Six describe a year-long period during which the grand jury believes that Burke and unnamed others conspired and attempted to rob individuals identified only as "Jane Doe #1" and " "Jane Doe #2" in a location identified only as "a residence in Queens, New York." Ind. ¶ 34.

The docket does not disclose the extent, if any, to which the government has identified with greater specificity any specific narcotics transactions, or conspiratorial acts that it will seek to prove in support of the allegations in Racketeering Act One. Nor does the docket disclose with any certainty the extent to which the government has more precisely identified the victims or location

of the robbery-related offenses alleged in Racketeering Act Six – although I do note that some of the discovery letters on the docket refer explicitly to a specific residence in Queens, New York. *See*, *e.g.*, DE 161 at 3.

What is clear is that the government has provided a great deal of discovery and that Burke has made no attempt, in seeking a bill of particulars, to describe the information already provided in a sufficiently detailed way that would allow me to understand why it falls short of the required standard of specificity. As the party seeking relief on this motion, Burke bears the burden of persuading the court that the information at his disposal is insufficient. The conclusory arguments he has submitted in that regard – which essentially summarize the allegations in the indictment and do not even acknowledge that any discovery has been provided – do not suffice. Accordingly, I respectfully recommend that the court deny the pending motions for a bill of particulars, without prejudice to a renewed motion by Burke that explains more precisely the portions of the indictment that subject him to unfair surprise and the reason that the discovery provided to date fails to alleviate that problem.

E.  Discovery

Burke next asks the court to compel the government to discharge its discovery obligations pursuant to Federal Rule of Criminal Procedure 16 "to the extent it has not already done so." Memo. I at 14. The government responds that it has in fact fully complied with its discovery obligations. Opp. I at 33. Because Burke provides no reason to think otherwise, *see* Memo. I at 14-15 (listing discovery demands but making no allegation that the government has failed to make any required disclosure), I respectfully recommend that the court deny this part of Burke' motion as moot.

F.     Multiplicity: Charges Relating To The Gebert Murder

Burke next contends that the indictment impermissibly includes three charges accusing

him of the Gebert murder. Memo. I at 15-21. As one of several predicate acts of the racketeering

conspiracy charged in Count One, the indictment alleges that Burke, together with codefendant

D'Arpino and others, conspired to participate in the conduct of the affairs of a criminal enterprise

in part by conspiring to murder and actually murdering Gebert in violation of New York State law.

Ind. ¶¶ 29-31 (Racketeering Act Five).[10] Count Two alleges that Burke and D'Arpino murdered

Gebert for the purpose of gaining entrance to and maintaining and advancing their positions within

the racketeering enterprise, in violation of Section 1959 of Title 18, United States Code. *Id.*

¶¶ 41-43. Count Three alleges that Burke and D'Arpino murdered Gebert while engaging in and

working in furtherance of a continuing criminal enterprise – an enterprise that engaged in a series

of narcotics offenses, in which Burke held a managerial position, and from which violations Burke

derived substantial income and resources – in violation of Section 848 of Title 21, United States

Code. *Id.* ¶¶ 44-45.

As the parties both acknowledge, a multiplicitous indictment – that is, an indictment that

charges a single crime in multiple counts – imperils a defendant's rights under the Double Jeopardy

clause of the Fifth Amendment. *See* Memo. I at 16; Opp. I at 19; *Brown v. Ohio*, 432 U.S. 161, 165

(1977); *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999). In seeking to compel the

government to make an election among the charges alleging the Gebert murder, Burke asks the

court to follow the reasoning of *United States v. Gardner*, 417 F. Supp. 2d 703 (D. Md. 2006), in

which the court rejected the "abstract formalism" (*id.* at 715) of the familiar "same elements"

---

[10]  When Burke filed his first omnibus motion, the allegations were labeled as Racketeering Act
Four and did not specify that D'Arpino was one of the others involved in the offenses. *See* DE 72
¶¶ 25-27. Those differences between the two pleadings have no effect on my analysis.

analysis under such Supreme Court decisions as *United States v. Dixon*, 509 U.S. 688, 696 (1993), and *United States v. Blockburger*, 284 U.S. 299, 304 (1932). *See* Memo. I at 16-19.

I am not free to recommend such an approach, nor is this court free to embrace it: controlling precedent within this jurisdiction explicitly rejects the reliance on *Gardner* that Burke proposes. *United States v. Basciano*, 599 F.3d 184, 198 (2d Cir. 2010). Instead, the court must apply the "same elements" test of *Dixon* and *Blockburger*. There can be no reasonable argument that each of the several charges in the indictment alleging the unlawful murder of Gebert requires the government to prove a unique combination of elements, and Burke implicitly acknowledges that reality in seeking to persuade the court to abandon *Dixon*. Accordingly, I respectfully recommend that the court deny this portion of Burke's motion.

G.        Multiplicity: Firearms Offenses

The parties agree that the offense alleged in Count Four (using, carrying, and possessing a firearm in connection with the racketeering conspiracy charged in Count One) is a lesser included offense within the crime alleged in Count Five (causing Gebert's death through the use of a firearm in the course of committing the offense charged in Count Four). Memo. I at 22; Opp. I at 22. The parties disagree, however as to the significance of that fact.

Burke argues that because Count Four is a lesser included offense within Count Five, the two charges are multiplicitous and that the government must therefore elect to prosecute only one of them. Memo. I at 21. In support of that position, he cites only *Rutledge v. United States*, 517 U.S. 292 (1996). *See* Memo. I at 22. In *Rutledge*, however, the Supreme Court did not rule that the government may not try both the lesser and greater forms of an offense in the same trial; it held no more than that where such simultaneous prosecution results in two convictions with cumulative punishments, one of the two convictions must be vacated. 517 U.S. at 307.

15

Consistent with that ruling, and citing the controlling case law of this jurisdiction, the government argues that the overlap between the two counts is no bar to their simultaneous prosecution, and that Burke is instead entitled only to have the sentences on both counts merged in the event he is found guilty of both. Opp. at 20-23 (citing, *inter alia*, *Whalen v. United States*, 445 U.S. 684, 691-92 (1980); *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) (per curiam). Because the government's position reflects a more accurate understanding of applicable law than Burke's, I respectfully recommend that the court deny this aspect of Burke's motion.

H.     *Brady* Disclosures

In his first omnibus motion, Burke asked the court to compel the government to discharge its obligation to disclose information that would exculpate him or impeach the witnesses or hearsay declarants whose statements will be offered in evidence. Memo. I at 22-25; *see Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); Fed. R. Evid. 806. Because the government acknowledges its obligations in this regard, Opp. I at 33, the motion to compel is moot, and I therefore respectfully recommend that the court deny it.

Burke further asked the court to conduct an independent review of the government's investigative files relating to the Gebert and Gotterup murders, to ensure that the government is fulfilling its legal obligations. *See* Memo. I at 24. I recommend against such oversight in the absence of either evidence to suggest that the government is failing to do so or a request by the government for such *ex parte* review to assist it in the performance of its duty.

In his second omnibus motion, Burke acknowledges that the government has made disclosures pursuant to *Brady* and *Giglio*, but complains that those disclosures were not sufficiently informative. Memo. II at 9-12. Specifically, Burke notes that the government, citing "'its obligations under *Brady* and *Giglio*'" has given him a post-trial motion that Burke filed in an

earlier case as well as the names of (plus other identifying information for) four individuals "who 'may have information that relates to the testimony and evidence to be presented at trial.'" Memo. II at 9 (citing DE 177-7 (copy of government's disclosure letter dated Oct. 25, 2010)). Burke contends that without further information, he cannot make effective use of the government's disclosures at trial. *Id*.; *see also id*. at 11 (complaining that the form of the government's disclosure "deprives counsel of the ability to make a reasoned determination of its relevance to Mr. Burke, let alone determine whether it is exculpatory or not and should be used at trial"); *id*. at 12 (complaining that the information as provided lacks "any of the essential facts permitting counsel to take advantage of this evidence"). He therefore asks that the court "conduct an *in camera* review of the source materials in order to determine whether they are required to be provided to counsel[,]" *id*. at 11, and order the government to "immediately identify which defendant(s) and what count(s) the material relates to." *Id*. at 12. I respectfully recommend against any such relief.

Even taken at face value, Burke's position is meritless. He acknowledges that, months before a trial date has even been set, the government has cited *Brady* and *Giglio* in disclosing specific documents and the names of four individuals. As far as his motion reveals, then, the only *in camera* review of "source materials" he seems to ask the court to undertake is to read the documents the government has given him and to speak to the persons the government has identified. Burke's counsel can do exactly that, and can make far better use in Burke's defense of the information so obtained than could the court. Nor does either *Brady* or *Giglio* – or the Due Process clause those decisions promote – require the government to spell out for Burke how he can or should take advantage of its disclosures. To the contrary, Burke's right to due process is satisfied as long as the government avoids suppressing exculpatory or impeaching information. Notwithstanding Burke's conclusory assertion, I see no reason why his counsel cannot, in the

months before trial during which he may investigate the government's disclosures and seek out the potential witnesses the government has named, make a reasoned determination of how best to take full advantage of the information disclosed.

Moreover, the record suggests that Burke's complaint should not be taken at face value. Burke argues that the government has left him to guess about how the four individuals identified in the letter of October 25, 2010, might be connected to the matters at issue in this prosecution. The government explains in detail why that is not so. *See* Opp. II at 25-26. Indeed, at oral argument on the second omnibus motion on February 25, 2011, *see* DE 201 (minute entry), Burke's counsel conceded that he did not yet know if his investigator had even attempted to contact the potential witnesses whom the government had identified. In addition, the government reported that it does not have, in any event, any statement by or other information about the potential witnesses that it has failed to disclose. I therefore respectfully recommend that the court deny Burke's request for supplemental *Brady* and *Giglio* disclosures.

I.    <u>Dismissal Of Counts Four and Five: Vagueness</u>

Burke next asserts that the allegations of Counts Four and Five should be dismissed because they are so vague as to deprive him of his Sixth Amendment right to be informed of the nature and cause of the accusation[s]" against him, and to permit the possibility that he has been deprived of his Fifth Amendment right to grand jury indictment. Memo. I at 25-27. The government boldly contends that Count Four "is not vague at all, much less impermissibly vague[,]" Opp. I at 25-26, and likewise contests Burke's characterization of Count Five. Although I do not fully embrace the government's position with respect to Count Four, I agree with it that neither count should be dismissed.

The parties essentially agree on the applicable legal standard. *See* Memo. I at 25-26; Opp. I at 23-24. An indictment is not impermissibly vague if it "contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet." *Russell v. United States*, 369 U.S. 749, 763 (1962) (internal quotation marks and citations omitted). It must provide sufficient detail to allow the defendant to vindicate his constitutional protection against double jeopardy, and it must contain sufficient detail to preclude the government from relying on facts other than those considered by the grand jury to establish the elements of the charged offense. *See United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999); *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975).

Count Four alleges that Burke – together with D'Arpino and unspecified others – used, carried, and possessed "one or more firearms" over the course of a 30-year period in connection with the racketeering conspiracy offense charged in Count One. Ind. ¶ 46. The latter offense, in turn, is predicated on several acts of racketeering over the same three-decade period, some intrinsically violent and some otherwise, and some of which occurred over relatively brief time-spans and one of which is alleged to have continued for a period of 21 years. *Id.* ¶¶ 17-40. By essentially reciting the essential elements as set forth in the pertinent statute, the offense alleged in Count Four could in theory be established with proof that Burke used, carried, or possessed (or bears accessorial responsibility for another person's use, carriage, or possession of) any firearm in the course of doing anything over the course of a 30-year period to further the objectives of the racketeering conspiracy he is alleged to have joined. Thus, viewed in isolation, Count Four plainly creates the risks that Burke identifies. The allegation makes it difficult, if not impossible, for Burke to determine whether any specific gun usage or possession the government might prove at trial differs from the grand jury's findings; moreover, the allegation provides virtually no notice to

Burke of what he must be prepared to meet at his trial for the offense. Under such circumstances, the government's contention that such a broad allegation is "not vague at all" is surprising, to say the least. Given the vast range of conduct that could suffice to prove the allegation in Count Four, Burke is plainly be entitled to additional information about how the government proposes to establish his guilt of that offense.

That does not mean, however, that dismissal is an advisable, or even available, remedy. Instead, Burke is entitled only to sufficient discovery, or at most a bill of particulars, so that he has adequate notice of the facts the government will seek to prove. Moreover, as explained above in parts D and E of this discussion, I conclude that Burke has not yet demonstrated that he is entitled even to such lesser forms of relief. In the absence of a showing of actual prejudice – and Burke has made no such showing here, or even attempted to do so – the court should not dismiss the charge for lack of specificity. *See*, *e.g.*, *Walsh*, 194 F.3d at 45; *United States v. Galestro*, 2008 WL 2783360, at *5 (E.D.N.Y. July 15, 2008).

The same result is even more plainly appropriate with respect to Count Five. The indictment explicitly informs Burke that he is accused of being criminally liable for the use of a gun to kill a specific person on a specific day. I cannot fathom – and Burke makes no effort to explain – what additional information Burke could reasonably require to be in a position to meet the government's proof or avoid double jeopardy. I therefore respectfully recommend that the court deny the motion to dismiss Counts Four and Five on the ground that each is impermissibly vague.

J.    Pre-Indictment Delay: Racketeering Act Two

Following the submission of Burke's initial omnibus motion, the government secured a superseding indictment that for the first time alleged, as part of the pattern of racketeering acts

charged in Count One, that Burke had conspired to murder and had murdered Daniel Zahn ("Zahn") in 1982. Ind. ¶¶ 20-22 (Racketeering Act Two). In his second omnibus motion, Burke's first argument is that the 28-year delay between the Zahn murder and the return of the superseding indictment violated his right to due process. Memo. II at 1-4. Although Burke does not yet identify the precise relief to which he believes he is entitled if the court agrees (at this point he seeks only "a hearing on this issue[,]" *id*. at 4), he does assert without explanation that he believes his alibi witnesses – who testified at his state court trial on the charge of murdering Zahn, resulting in an acquittal – are now dead or otherwise unavailable. *Id*. at 4. He further contends that he will be "severely prejudiced if forced to go to trial for this crime without this evidence being available." *Id*. Burke therefore requested a hearing on the matter. At the hearing on February 25, 2011, neither party proffered any evidence, but the government acknowledged that four of the five alibi witnesses from Burke's earlier trial are now deceased, and that it will provide contact information for the fifth. For the reasons set forth below, I see no basis for an evidentiary hearing; on the basis of the submitted papers alone, I respectfully recommend that the court can and should deny Burke's request for relief.

The parties agree that the inclusion of allegations about the Zahn murder in the instant indictment violates Burke's right to due process only if Burke can demonstrate that the delay in bringing the charge has caused him actual, substantial prejudice and that the government intentionally caused the delay to gain a tactical advantage. Memo. II at 1 (citing *United States v. Marion*, 404 U.S. 307 (1971); Opp. II at 6 (citing *Marion*, 404 U.S. at 324). Burke's effort to meet those requirements is insufficient.

I assume that the death of four of Burke's alibi witnesses, and the passage of time, combine to satisfy the prejudice requirement, and indeed the government did not argue otherwise at the

hearing on February 25, 2011.[11] Burke cannot establish, however, that the government sought a tactical advantage in delaying its charging decision with respect to the Zahn murder. Instead, he simply argues without citation to any authority that once he establishes prejudice, the burden shifts to the government to explain the delay. He is incorrect. Burke bears the burden of demonstrating the government's impermissible motivation for the delay, and cannot secure relief if he fails to meet that burden. *See*, *e.g.*, *United States v. Corneille*, 171 F.3d 748, 752 (2d Cir. 1999); *United States v. Hoo*, 825 F.2d 667, 671 (2d Cir. 1987).[12] Accordingly, in the absence of any showing of improper motivation for the government's delay in accusing Burke of the Zahn murder, I respectfully recommend that the court deny Burke any relief on this aspect of his motion.

---

[11] I asked the government to address whether it would seek to preclude the admission in evidence of the state court testimony of the deceased alibi witnesses. Although such statements are technically hearsay, the fact that they were subject to cross-examination by prosecutors (albeit of a different sovereignty) with a motive to impeach similar to the government's in this case might suffice to render the statements admissible pursuant to Federal Rule of Evidence 807. If the government were prepared to stipulate to the admissibility of such statements, the showing of prejudice would plainly be weaker. Nevertheless, the government explicitly stated its intention to preserve its ability to oppose introduction of the prior testimony, even at the risk of compromising its argument on the instant issue.

[12] At oral argument, Burke's counsel argued in the alternative that even in the absence of a showing of improper motive, the government's opposition to the admission of the alibi witnesses' prior testimony should provide a basis for the court to excuse compliance with that requirement. I disagree. If the defendant's theory is that the government's position, if successful, will compound the prejudice, then the point is irrelevant: I already assume that Burke has sufficiently demonstrated prejudice flowing from the delay; but that fact does not undermine the rationale for requiring a showing of improper governmental purpose in seeking the delay. If, on the other hand, Burke's point is that the government's improper purpose should be presumed from its unwillingness to alleviate the prejudice flowing from the delay by acceding to the admission of the testimony, he may be on slightly more solid footing – although his counsel conceded he had no legal authority for the argument. Nevertheless, I conclude that there is an important difference between intentionally taking steps to gain tactical advantage through needless delay and, as appears to the case here, a decision by the prosecutors to resist ceding an otherwise proper evidentiary advantage by opposing the admission of statements that they will not be able to test through cross-examination. That difference is precisely the one that the Supreme Court endorsed decades ago: while the prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935).

K.     Dismissal Of Counts Four And Five: Statute Of Limitations

Burke next asks the court to dismiss Counts Four and Five because they were not charged within the applicable limitations period.[13] Memo. II at 4-6. Count Four alleges that during the period from January 1980 through January 2010, Burke used, carried, possessed, brandished, and discharged a firearm during the course and in furtherance of the racketeering conspiracy offense charged in Count One. Ind. ¶ 46 (citing 18 U.S.C. § 924(c)(1)(A)(i)-(iii)). Count Five alleges that on or about July 16, 1996, Burke used a firearm to kill Gebert in the course of committing the firearms offense charged in Count Four. Ind. ¶ 47 (citing 18 U.S.C. § 924(j)(1)).

The government initially responds that dismissal under the statute of limitations is not permissible until it has had a chance to present its evidence to a trial jury. Opp. II at 11. I disagree. The government does not take the position that it has some as-yet undisclosed evidence that would, if credited by the trial jury, place the offending conduct within the limitations period. The government plainly contemplates that both counts will be supported by proof that Burke (together others for whose conduct he is properly held liable) used a gun in the course of killing Gebert in 1996. *See* Opp. II at 14 (acknowledging that its case rests on "the defendant's use of the firearm more than five years before his indictment"); *see also* Opp. I at 22 (acknowledging that the offense alleged in Count Four is a lesser-included offense within Count Five). Whether such a finding can support a lawful conviction under Counts Four and Five is thus a purely legal question that is as ripe for resolution now as it will ever be. I therefore respectfully recommend that the court address the issue on the merits now rather than at the close of the government's case-in-chief.

---

[13]  In seeking such relief with respect to Count Four, Burke raises an argument not made in support of the claim for similar relief in his first omnibus motion, which I have addressed above in Part B of this discussion.

The government's fallback position is more persuasive: the operative date for purposes of the firearms offenses charged in Counts Four and Five – that is, the date upon which the five-year limitations period begins to run pursuant to 18 U.S.C. § 3282(a) – is the last date on which the underlying offense was committed. Opp. II at 14. *See United States v. Rodriguez-Moreno*, 526 U.S. 275, 281 (1999) ("In our view, § 924(c)(1) does not define a 'point-in-time' offense when a firearm is used during and in relation to a continuing crime of violence.") (cited in Opp. II at 15 n.5); *United States v. Payne*, 591 F.3d 46, 69 (2d Cir. 2010) ("When a defendant is convicted of violating § 924(c)(1)(A) for using or carrying a firearm during and in relation to a crime that is a continuing offense, the § 924(c)(1) crime itself is a continuing offense.") (citing *Rodriguez-Moreno*; cited in Opp. II at 15 n.5). As a result, even if the government proves that Burke's use of a gun in connection with the racketeering conspiracy charged in Count One occurred only in 1996 in connection with the Gebert murder, the period in which he "committed" the offense charged in Count Four, for purposes of the statute of limitations, was coextensive with the period in which he committed the underlying offense charged in Count One – namely, through January 2010. Because that date falls well within the limitations period, Count Four is timely. Similarly, because the offense charged in Count Five is predicated on Count Four, the timeliness of the latter charge renders the former timely as well.

> L.    Severance: Co-Defendants Charged With Witness Tampering

Burke's two codefendants are both charged, in Counts Six and Seven, with conspiring and attempting to tamper with a witness in violation of Section 1512 of Title 18, United States Code. Ind. ¶¶ 48-49. In addition, the racketeering conspiracy alleged in Count One includes the same charges against defendant D'Arpino alone. *Id*. ¶¶ 38-40 (Racketeering Act Eight). Burke contends that the joinder of such charges with those against him is unduly prejudicial and that the court

should therefore exercise its discretion pursuant to Federal Rule of Criminal Procedure 14 to grant

him a severance from his codefendants. Memo. II at 7-8. I disagree.

The court should grant a severance "only if there is a serious risk that a joint trial would

compromise a specific trial right of [Burke's] or prevent the jury from making a reliable judgment

about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Burke has

demonstrated no such risk here. The sole potential problem arising from a joint trial that Burke

identifies is the risk that he will suffer spillover prejudice from the admission against his

codefendants of evidence relating to the witness tampering charges that would not be admissible if

he were tried alone.[14] The court can adequately guard against that risk through the use of limiting

instructions, which the jury will presumably obey. *See id*. at 540-41 (citing *Richardson v. Marsh*,

481 U.S. 200, 211 (1987)). I therefore respectfully recommend that the court decline to sever

Burke's trial from that of his codefendants on the witness tampering charges.

M.     Severance: Racketeering Act Two

Finally, Burke asks the court to "exercise the substantial discretion afforded to it under

[Fed. R. Crim. P.] 14(a) to sever Racketeering Act Two from the remaining charges against [him]

to ensure he receives a fair trial." Memo. II at 9. The court has no such discretion. The applicable

rule authorizes the court to order severance or other relief to cure the prejudicial "joinder of

offenses or defendants[,]" Fed. R. Crim. P. 14(a); it does not authorize the court to grant such relief

---

[14]  For purposes of this analysis, I assume that Burke is correct in positing that such evidence
would be inadmissible against him. I note, however, that the assumption is hardly inevitable: proof
of the allegedly obstructive conduct would plainly be relevant and probative of the allegation –
made against Burke as well as his codefendants – that "members and associates of the Gambino
crime family engaged in conduct designed to prevent government detection of their … illegal
activities[.]" Ind. ¶ 10. Whether such evidence would necessarily be excluded as unduly
prejudicial in comparison to its probative value, *see* Fed. R. Evid. 403, is a determination that
cannot be made at this stage of the proceedings.

to overrule the grand jury's decision to choose to include specific factual allegations in charging a single criminal offense. Yet that is precisely what Burke asks the court to do in requesting the severance of a single racketeering act from within a larger racketeering conspiracy charge.

Even if the court had the authority to grant the relief Burke seeks, I would recommend against exercising it. Such a result would needlessly deprive the government of the ability to seek Burke's conviction on Count One based on a pattern of racketeering activity consisting of the Zahn murder and one other predicate. Moreover, Burke does not explain how the court could properly instruct a jury as to the elements of the racketeering conspiracy, or of the separately tried racketeering act, if he were granted the relief he seeks. I cannot fathom how the court could fashion such instructions without unfair prejudice to the rights of one side or the other in this case.

In *United States v. Urso*, 369 F. Supp. 2d 254 (E.D.N.Y. 2005), Judge Garaufis thoroughly explained why a request to sever predicate acts within a single racketeering count is a *non sequitur*. *See id.* at 262-63. Because I completely agree with that analysis, I respectfully recommend that the court decline to sever the trial of Racketeering Act Two from the remainder of the charges against Burke.

III.    Recommendation

For the reasons set forth above, I respectfully recommend that the court deny each of defendant John A. Burke's two omnibus motions in its entirety.

IV.    Objections

Any objections to this Report and Recommendation must be filed no later than March 15, 2011. Failure to file objections within this period designating the particular issues to be reviewed waives the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P.

59(a), (b)(2); *see also Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

**SO ORDERED.**

Dated: Brooklyn, New York
February 26, 2011

/s/ James Orenstein
JAMES ORENSTEIN
U.S. Magistrate Judge